**TOSTRUD LAW GROUP, P.C.**
JON A. TOSTRUD
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 278-2600
Facsimile: (310) 278-2640
Email: jtostrud@tostrudlaw.com

[*Additional Counsel on Signature Page*]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAJIV CHUGH And SARITA CHUGH, Derivatively on Behalf of ORACLE CORPORATION, | Case No.: 5:19-cv-764 |
| Plaintiffs, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| JEFFREY S. BERG, MICHAEL J. BOSKIN, SAFRA A. CATZ, BRUCE R. CHIZEN, GEORGE H. CONRADES, LAWRENCE J. ELLISON, HECTOR GARCIA-MOLINA, JEFFREY O. HENLEY, MARK V. HURD, RENÉE J. JAMES, CHARLES W. MOORMAN IV, LEON E. PANETTA, WILLIAM G. PARRETT, and NAOMI O. SELIGMAN, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| -and- | |
| ORACLE CORPORATION, | |
| Nominal Defendant. | |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Rajiv Chugh and Sarita Chugh ("Plaintiffs"), by and through their undersigned counsel, derivatively on behalf of Nominal Defendant Oracle Corporation ("Oracle" or the "Company"), submit this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by Oracle with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Oracle against certain of its officers and directors seeking to remedy Defendants' violations of state and federal law during that have occurred from May 10, 2017 through the present (the "Relevant Period") and have caused substantial harm to Oracle.   Plaintiffs seek to remedy Defendants' violations of state and federal law during the relevant period that have caused and continue to cause substantial monetary losses to Oracle and other damages, including damages to its reputation and goodwill.

## JURSIDICTION AND VENUE

2.      Pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) and 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

3.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

4.      Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Oracle maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Oracle, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

**Plaintiffs**

5.      ***Plaintiff Rajiv Chugh*** is a current owner of Oracle stock and has held the stock during the time of Defendants' continuous wrongful course of conduct alleged herein.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Company.

6.      ***Plaintiff Sarita Chugh*** is a current owner of Oracle stock and has held the stock during the time of Defendants' continuous wrongful course of conduct alleged herein.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Company.

**Nominal Defendant**

7.      Nominal Defendant Oracle is a multinational technology company.  The Company maintains its corporate headquarters at 500 Oracle Parkway, Redwood City, California.

**Director Defendants**

8.      ***Defendant Jeffrey S. Berg*** ("Berg") has been a Director of the Company since 1997.   Defendant Berg is a member of the Finance and Audit Committee, the Governance Committee, and the Chair of the of the Independence Committee.

9.      ***Defendant Michael J. Boskin*** ("Boskin") has been a Director of the Company since 1994.  Defendant Boskin is the Chair of the Finance and Audit Committee.

10.     **Defendant Safra A. Catz** ("Catz") has been a Director of the Company since 2001. Defendant Catz is also the Chief Executive Officer of the Company.  The Company's DEF 14A, dated September 26, 2018 ("2018 Proxy") states that Defendant Catz is not independent.

11.     **Defendant Bruce R. Chizen** ("Chizen") has been a Director of the Company since 2008.  Defendant Chizen is also a member of the Finance and Audit Committee and the Chair of the Governance Committee.

12.     **Defendant George H. Conrades** ("Conrades") has been a Director of the Company since 2008.  Defendant Conrades is a member of the Independence Committee and also the Chair of the Compensation Committee.

13.     **Defendant Lawrence J. Ellison** ("Ellison") has been the Chairman of the Board, Chief Technology Officer (CTO) and Founder, Oracle Corporation since 1977.   The Company's 2018 Proxy states that Defendant Ellison is not independent.

14.     **Defendant Hector Garcia-Molina** ("Garcia-Molina") has been a Director of the Company since 2001.    Defendant Garcia-Molina is also a member of the Independence Committee.

15.     **Defendant Jeffrey O. Henley** ("Henley") has been a Director of the Company since 1995.  Defendant Henley is also the Vice Chairman of the Board of Oracle.  The Company's 2018 Proxy states that Defendant Henley is not independent.

16.     **Defendant Mark V. Hurd** ("Hurd") has been a Director of the Company since 2010.   Defendant Hurd is also the CEO of Oracle.   The Company's 2018 Proxy states that Defendant Hurd is not independent.

17.      **Defendant Renée J. James** ("James") has been a Director of the Company since 2015.  The Company's 2018 Proxy states that Defendant James is not independent.

18.     **Defendant Charles W. Moorman IV** ("Moorman") has been a Director of the Company since 2018.   Defendant Moorman is a member of the Compensation Committee.

19.     **Defendant Leon E. Panetta** ("Penetta") has been a Director of the Company since 2015.    Defendant Panetta is a member of the Governance Committee and the Compensation Committee.

20.     ***Defendant William G. Parrett*** ("Parrett") has been a Director of the Company since 2018.   Defendant Parrett is a member of the Finance and Audit Committee.

21.     ***Defendant Naomi O. Seligman*** ("Seligman") has been a Director of the Company since 2018.   Defendant Parrett is the Vice Chair of the Compensation Committee.

22.     Defendants Berg, Boskin, Catz, Chizen, Conrades, Ellison, Garcia-Molina, Henley, Hurd, James, Moorman, Panetta, Parrett, and Seligman are referred to herein as the "Director Defendants" or "Individual Defendants."

## ORACLE'S CORPORATE GOVERNANCE

23.     As members of Oracle's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

24.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Oracle, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF THE DIRECTOR DEFENDANTS

25.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Oracle, the Director Defendants owed Oracle and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage Oracle in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of Oracle and its investors.

26.     Each director of the Company owes to Oracle and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as

well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

27. To discharge their duties, the officers and directors of Oracle were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of Oracle were required to, among other things:

    (a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

    (b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

    (c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

    (d)    remain informed as to how Oracle conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

    (e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

    (f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

28.     Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Oracle, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

29.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company.  As a result, Oracle has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

**CHARTER OF THE
FINANCE AND AUDIT COMMITTEE OF
THE ORACLE CORPORATION BOARD OF DIRECTORS**

30.     The primary functions of the Finance and Audit Committee (the "Committee") are to assist the Board with its oversight of:

- management's conduct of the Corporation's financial accounting and reporting processes;
- the integrity of the Corporation's financial statements;
- the Corporation's compliance with legal and regulatory requirements;
- its independent registered public accounting firm's qualifications, performance and independence (the "Independent Accountants");
- the performance of the Corporation's internal audit function; and
- the evaluation of merger and acquisition transactions and investment transactions proposed by the Corporation's management.

31.     In furtherance of its purpose, the Committee shall have the following responsibilities and duties:

Documents/Reports Review

Review and discuss with management and the Independent Accountants the Corporation's annual audited financial statements, quarterly financial statements and any other reports or financial information deemed appropriate by the

Committee, including any certification, report, opinion, or review rendered by the Independent Accountants.

Review and discuss with management of the Corporation the Form 10Qs and the Form 10Ks prior to filing. The Chair of the Committee may represent the entire Committee for purposes of this review.

Discuss from time to time the Corporation's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

Prepare any report or other disclosure by the Committee required to be included in any proxy statement for the election of the Corporation's directors under the rules of the SEC.

Review the regular internal reports to management prepared by the internal audit department and management's response to such reports.

At least annually, obtain and review a report by the Independent Accountants describing: the firm's internal quality control procedures; any material issues raised by the most recent internal quality control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and (to assess the accountants' independence) all relationships between the Independent Accountants and the Corporation.

Review and assess periodically the adequacy of this Charter and recommend any proposed changes to the Board for approval.

*       *       *

Miscellaneous

Oversee the Corporation's policies and procedures regarding compliance with applicable laws and regulations and with the Corporation's Code of Conduct and Business Ethics and receive reports from the General Counsel and/or the Global Chief Compliance and Ethics Officer.

## **BACKGROUND**

32.     Based in California, the Company is one of the world's largest software companies. The Company develops database software and technology, cloud engineered systems, and enterprise software products.

33.    Oracle's revenues were driven by the sale of the Company's on premises software services, but those revenues have stagnated in recent years as customers shifted to cloud-based programs.

34.    In 2008, when cloud-based software products began to gain popularity and technology companies such as Google and Amazon were starting to expand into this new area of data storage, Oracle stated its intention to stay out of the cloud business.  At the time, Defendant Ellison, called cloud storage "complete gibberish" and questioned when this "idiocy [was] going to stop?"  By 2015, however, as cloud storage entered the mainstream, Oracle publicly acknowledged the importance of developing successful cloud services in order to compete with platforms offered by Amazon and Microsoft and began to aggressively pursue several acquisitions in an attempt to expand its cloud offerings.

35.    Oracle had ceded significant market share to its competitors as a result of coming late to this area. Instead of focusing on creating a better product, however, Oracle relied on improper sales practices to railroad its customers into purchasing the Company's cloud offerings. One such practice was to "audit" customers' use of the Company's non-cloud software licenses and charge those customers hefty penalties unless they agreed to shift their business to Oracle cloud programs.  The Company's use of audits was well known within the industry, but the extent to which the Company was using threats of audits to coerce customers to purchase cloud products was not known to investors, and expressly denied by the Company.

36.    In addition to threatening customers with audits, the Company also decreased its customer support for certain of its on-premises and hardware systems, in an effort to drive customers away from such systems and into cloud-based systems.  The Company also strong-armed customers by threatening to dramatically raise the cost of legacy database licenses if the customer chose another cloud provider.

### ORACLE DEFRAUDS INVESTORS

37.    On May 10, 2017, Ken Bond (the Company's Senior Vice President of Investor Relations) touted on a Company conference call that the Company's cloud business was growing stating that "[t]he good news . . . growth in cloud is actually getting bigger."

38.     During the conference call, an analyst questioned how much of the Company's revenue growth was attributable to the Company's practice of auditing its customers.  In response, Bond immediately deflected the question, stating that "[i]t's funny. This is one of those things where – gets talked about a lot. And I think this is one of those things where the story is a lot bigger than the realities."  Bond also assured investors that the Company's auditing practices were not used to coerce customers into purchasing products and that the Company approaches its audits in "as gracious [a] way as we can," and stated that "as we go to cloud . . . this conversation is going to go away."

39.     The statements and omissions set forth above were false and misleading because the growth in the Company's cloud revenues were driven, in part, by improper, coercive sales practices, which include: (a) threatening existing customers with "audits" of their use of the Company's non-cloud software licenses and levying expensive penalties against those customers, unless the customers agreed to shift their business to the Company cloud programs; (b) decreasing customer support for certain Company on-premises or hardware systems, in an effort to drive customers away from such systems and into cloud-based systems; and (c) strong-arming customers by threatening to dramatically raise the cost of legacy database licenses if the customers choose another cloud provider.

40.     On June 21, 2017, the Company issued a press release announcing its financial results for the fiscal fourth quarter and fiscal year ended May 31, 2017.  In the press release, the Company reported that quarterly "cloud revenues were up 58% to $1.4 billion."  The press release also quoted Defendant Catz stating that the Company was "experience[ing] rapid adoption of the Oracle Cloud."  In the press release, Defendant Hurd is quoted stating that Oracle "sold $855 million of new annually recurring cloud revenue (ARR) in Q4" and touting that "[n]ext year is going to be even better.  We expect to sell a lot more than $2 billion in new cloud ARR in fiscal year 2018."

41.     On that same day, the Company held a conference call with analysts and investors to discuss its earnings and operations.  During the conference call, Defendant Ellison told investors that the Company's cloud revenues would "accelerate into hyper-growth" as existing

customers "begin to migrate their millions of Oracle databases" to Oracle's cloud-based offerings.
Also, during the call, Defendant Catz attributed Oracle's cloud revenue growth to "the increasing
preference of customers for cloud."

42.     During that same conference call, an analyst questioned whether the Company's
"phenomenal quarter around this aggressive cloud transition" was a "1-year phenom[enon]."
Defendant Catz responded that "this is absolutely not a 1-year phenomena. In fact, what you
should see, as this goes on, is we will have less drag from the [cloud] transition and the base will
continue to grow."

43.     The statements and omissions set forth above were false and misleading.  The
growth in Oracle's cloud revenues were driven, in part, by improper, coercive sales practices,
which include: (a) threatening existing customers with "audits" of their use of the Company's non-
cloud software licenses and levying expensive penalties against those customers, unless the
customers agreed to shift their business to the Company cloud programs; (b) decreasing customer
support for certain Oracle on-premises or hardware systems, in an effort to  drive customers away
from such systems and into cloud-based systems; and (c) strong-arming customers by threatening
to dramatically raise the cost of legacy database licenses if the customers choose another cloud
provider.

44.     On September 14, 2017, the Company issued a press release reporting its financial
results for the fiscal first quarter ended August 31, 2017.  In the press release, the Company
reported that "Total Cloud Revenues were up 51% to $1.5 billion."  The press release also quotes
Defendant Catz stating that the "sustained hypergrowth in our multi-billion dollar cloud business
continues to drive Oracle's overall revenue and earnings higher and higher."

45.     On that same day, the Company held a conference call with analysts and investors
to discuss its earnings and operations.  During the call, Defendant Catz touted that "[c]ustomer
adoption of our cloud products and services continue to be very, very strong."  Also, Defendant
Hurd stated that "cloud bookings were executing well on a very big and growing pipeline" and
that the Company expected that fiscal year 2018 full year "cloud booking growth to be quite
strong."  Hurd attributed the Company's cloud revenue growth to being better than the

1  competition, noting specifically that "our products are better. Our sales force is better. Our ability

2  to implement is better." Defendant Hurd also stated that the Company's "ability to do all of these

3  things has just continued to improve quarter by quarter by quarter, and it manifests itself in the

4  type of results we're talking about this afternoon."

5  46.    The statements and omissions set forth above were false and misleading because

6  the growth in the Company's cloud revenues were driven, in part, by improper, coercive sales

7  practices, which include: (a) threatening existing customers with "audits" of their use of the

8  Company's non-cloud software licenses and levying expensive penalties against those customers,

9  unless the customers agreed to shift their business to the Company cloud programs; (b) decreasing

10  customer support for certain Oracle on-premises or hardware systems, in an effort to drive

11  customers away from such systems and into cloud-based systems; and (c) strong-arming

12  customers by threatening to dramatically raise the cost of legacy database licenses if the customers

13  choose another cloud provider.

14  47.    On September 18, 2017, the Company filed with the SEC its Form 10-Q for the

15  fiscal first quarter ended August 31, 2017, stating the financial results announced in the September

16  14 press release. In the quarterly report, the Company touted "higher growth of our cloud SaaS

17  and cloud PaaS and IaaS revenues as customer preferences have pivoted to the Oracle Cloud for

18  new deployments and as customers migrate to and expand with the Oracle Cloud for their existing

19  on-premise workloads." The Company attributed its cloud revenue growth to "increased . . .

20  investments in and focus on the development, marketing and sale of our cloud-based applications,

21  platform and infrastructure technologies." The Company also touted the superior quality of its

22  cloud products, stating that its products "provide a comprehensive and fully integrated stack of

23  applications, platform, compute, storage and networking services in all three primary layers of the

24  cloud."

25  48.    The statements and omissions set forth above were false and misleading because

26  the growth in the Company's cloud revenues were driven, in part, by improper, coercive sales

27  practices, which include: (a) threatening existing customers with "audits" of their use of Oracle's

28  non-cloud software licenses and levying expensive penalties against those customers, unless the

customers agreed to shift their business to Oracle cloud programs; (b) decreasing customer support for certain Company on-premises or hardware systems, in an effort to drive customers away from such systems and into cloud-based systems; and (c) strong-arming customers by threatening to dramatically raise the cost of legacy database licenses if the customers choose another cloud provider.  The Company had to rely on these coercive practices given that its cloud-based offering is a "bare-bones minimum viable product," not "a comprehensive and fully integrated stack of applications" as the Company represented.

49.     On October 5, 2017, the Company presented at the OpenWorld Financial Analyst Meeting. During this event, Steve Miranda (Executive Vice President of Oracle Applications Product Development) touted that the Company's cloud business was experiencing rapid growth and attributed that growth to being more "customer-focused" and "much more intimate partners with our customer."

50.     The statements and omissions set forth above were materially false and misleading. In truth, the growth in the Company's cloud revenues were driven, at least in part, by improper, coercive sales practices, which include: (a) threatening existing customers with "audits" of their use of Oracle's non-cloud software licenses and levying expensive penalties against those customers, unless the customers agreed to shift their business to Oracle cloud programs; (b) decreasing customer support for certain Company on-premises or hardware systems, in an effort to drive customers away from such systems and into cloud-based systems; and (3) strong-arming customers by threatening to dramatically raise the cost of legacy database licenses if the customers choose another cloud provider.

51.     On December 14, 2017, the Company issued a press release reporting its financial results for the fiscal second quarter ended November 30, 2017.  In the press release, the Company reported that "Total Cloud Revenues were up 44% to $1.5 billion."  The press release also attributes this revenue growth, at least in part, to "the increasing scale and the gathering momentum in our cloud business."

52.     On that same day, the Company held a conference call with analysts and investors to discuss its earnings and operations.  During that call, Defendant Catz boasted that "[c]ustomer

adoption of our cloud products and services continues to be very strong. . . .  Bottom line, our transition to the cloud is going well."

53.     The statements and omissions above were false and misleading because the growth in the Company's cloud revenues were driven, at least in part, by  improper, coercive sales practices, which include: (a) threatening existing customers with "audits" of their use of the Company's non-cloud software licenses and levying expensive penalties against those customers, unless the customers agreed to shift their business to Oracle cloud programs; (b) decreasing customer support for certain Company on-premises or hardware systems, in an effort to drive customers away from such systems and into cloud-based systems; and (c) strong-arming customers by threatening to dramatically raise the cost of legacy database licenses if the customers choose another cloud provider.

## DISCLOSURES OF COMPANY'S MISCONDUCT

54.     The truth about the Company's practices and the impact on the Company's business was disclosed on March 19, 2018, when the Company revealed that cloud revenue growth had stagnated and forecasted significantly slower sales growth for its cloud business than its competitors.

55.     The Company reported that quarterly cloud revenue rose only 32%, or just half the average reported quarterly growth over the past two years, and the Company projected that cloud sales growth would decline even further to only 20% in the following quarter.  As a result of these disclosures, the Company's shares declined by $4.90 per share, or nearly 9.5%.

56.     Following these disclosures, market researchers and the media connected the Company's poor financial performance to its aggressive sales tactics.  These recent disclosures suggest that the growth in the Company's cloud revenues were driven by improper, coercive sales practices.

57.     One market commentator—Gartner, Inc.—also observed that the Company's cloud offering "remains a barebones minimum viable product, and it is arguably too minimal to be viable for a broad range of common cloud . . . use cases."

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

58.     Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

59.     Plaintiffs will adequately and fairly represent the interests of Oracle in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

60.     Plaintiffs are current owners of the Company stock and have continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.   Plaintiffs understand their obligation to hold stock throughout the duration of this action and are prepared to do so.

61.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

62.     The Company Board is currently comprised of fourteen (14) members – Berg, Boskin, Catz, Chizen, Conrades, Ellison, Garcia-Molina, Henley, Hurd, James, Moorman, Panetta, Parrett, and Seligman.   Thus, Plaintiffs are required to show that a majority of the Director Defendants, *i.e.*, seven (7), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

63.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

64.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

65.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

66.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

67.     Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**The Director Defendants Are Not Independent or Disinterested**

**Defendant Catz**

68.     Defendant Catz is not disinterested or independent, and therefore, is incapable of considering demand because she (as CEO) is an employee of the Company who derives substantially all her income from her employment with Oracle, making him not independent.  As such, Defendant Catz cannot independently consider any demand to sue herself for breaching her fiduciary duties to Oracle, because that would expose her to liability and threaten her livelihood.

69.     Oracle acknowledged that Catz is not independent in its Form DEF 14A filed with the SEC on September 26, 2018.

70.     In addition, Defendant Catz is a defendant in the securities class action entitled *City of Sunrise Firefighters' Pension Fund v. Oracle Corp., et al.*, Case 5:18-cv-04844-BLF (N.D. Cal.) (the "Securities Class Action").

**Defendant Ellison**

71.     Defendant Ellison is not disinterested or independent, and therefore, is incapable of considering demand because he (as CTO) is an employee of the Company who derives substantially all his income from his employment with Oracle, making him not independent.  As

such, Defendant Ellison cannot independently consider any demand to sue himself for breaching his fiduciary duties to Oracle, because that would expose him to liability and threaten his livelihood.

72.     Oracle acknowledged that Ellison is not independent in its Form DEF 14A filed with the SEC on September 26, 2018.

73.     In addition, Defendant Ellison is a defendant in the Securities Class Action.

**<u>Defendant Henley</u>**

74.     Defendant Henley is not disinterested or independent, and therefore, is incapable of considering demand because he (as vice Chairman of the Board) is an employee of the Company who derives substantially all his income from his employment with Oracle, making him not independent.  As such, Defendant Henley cannot independently consider any demand to sue himself for breaching his fiduciary duties to Oracle, because that would expose him to liability and threaten his livelihood.

75.     Additionally, Oracle acknowledged that Henley is not independent in its Form DEF 14A filed with the SEC on September 26, 2018.

**<u>Defendant Hurd</u>**

76.     Defendant Hurd is not disinterested or independent, and therefore, is incapable of considering demand because he (as CEO) is an employee of the Company who derives substantially all his income from his employment with Oracle, making him not independent.  As such, Defendant Hurd cannot independently consider any demand to sue himself for breaching his fiduciary duties to Oracle, because that would expose him to liability and threaten his livelihood.

77.     Oracle acknowledged that Hurd is not independent in its Form DEF 14A filed with the SEC on September 26, 2018.

78.     In addition, Defendant Hurd is a defendant in the Securities Class Action.

**<u>Defendant James</u>**

79.     Oracle acknowledged that James is not independent in its Form DEF 14A filed with the SEC on September 26, 2018.

**<u>Defendants Berg, Boskin, Chizen, and Parrett</u>**

80.     Defendants Berg, Boskin, Chizen, and Parrett are members of the Company's Finance and Audit Committee.

81.     As a member of the Finance and Audit Committee, Defendants Berg, Boskin, Chizen, and Parrett were tasked with reviewing the Company's compliance with applicable laws and regulations and reviewing and overseeing any policies, procedures and programs designed to promote such compliance.

82.     Defendants Berg, Boskin, Chizen, and Parrett breached their fiduciary duties of due care, loyalty, and good faith, because as members of the Audit Committee, inter alia, they allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the deficiencies described above.   Therefore, Defendants Berg, Boskin, Chizen, and Parrett face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## COUNT I

### Against the Director Defendants for Breach of Fiduciary Duty

83.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

84.     The Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

85.     The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

86.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.   Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported business performance, as alleged herein.   These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

87.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

88.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, and reputational harm.

**COUNT II**

**Against the Director Defendants for Gross Mismanagement**

89.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

90.     By their actions alleged herein, the Director Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

91.     As a direct and proximate result of the Director Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

92.     Because of the misconduct and breaches of duty alleged herein, the Director Defendants are liable to the Company.

**COUNT III**

**Against the Director Defendants for Waste of Corporate Assets**

93.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

94.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

95.   As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

96.   As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

97.   Plaintiffs, on behalf of Oracle, have no adequate remedy at law.

## COUNT IV
### Against the Director Defendants for Violations of Section 10(b)
### of the Exchange Act and SEC Rule 10b-5

98.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

99.   During the Relevant Period, the Director Defendants disseminated or approved public statements that failed to disclose that the growth in the Company's cloud revenues were driven, in part, by improper, coercive sales practices, which include: (a) threatening existing customers with "audits" of their use of the Company's non-cloud software licenses and levying expensive penalties against those customers, unless the customers agreed to shift their business to the Company cloud programs; (b) decreasing customer support for certain Company on-premises or hardware systems, in an effort to drive customers away from such systems and into cloud-based systems; and (c) strong-arming customers by threatening to dramatically raise the cost of legacy database licenses if the customers choose another cloud provider.

100.   Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants.

101.   As such, the Director Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)   employed devices, schemes, and artifices to defraud; and

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

102.    As a result of the Director Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

## COUNT V

### Against the Director Defendants
### for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9

103.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

104.    SEC Rule 14a-9, promulgated pursuant to section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.  Specifically, the Company's Proxy violated section 14(a) of the Exchange Act and SEC Rule 14a-9 because it included materially false and misleading information and failed to disclose that the growth in the Company's cloud revenues were driven, in part, by improper, coercive sales practices, which include: (a) threatening existing customers with "audits" of their use of the Company's non-cloud software licenses and levying expensive penalties against those customers, unless the customers agreed to shift their business to the Company cloud programs; (b) decreasing customer support for certain Company on-premises or hardware systems, in an effort to drive customers away from such systems and into cloud-based systems; and (c) strong-arming customers by threatening to dramatically raise the cost of legacy database licenses if the customers choose another cloud provider.

105.    In the exercise of reasonable care, the Director Defendants should have known that the statements contained in the Proxy were materially false and misleading.

106.    The misrepresentations and omissions in the Proxy were material to Company stockholders in voting on the matters set forth for stockholder ratification in the Proxy.  The Proxy was an essential link in the accomplishment of the continuation of these defendants' continued violation of their fiduciary duties.

107.    The Company was damaged as a result of these defendants' material misrepresentations and omissions in the Proxy.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(A)     Declaring that Plaintiffs may maintain this action on behalf of the Company and that Plaintiffs are adequate representatives of the Company;

(B)     Finding Defendants liable for breaching their fiduciary duties owed to the Company;

(C)     Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the wrongful conduct described herein;

(D)     Awarding Plaintiffs the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

(E)     Awarding such other and further relief as is just and equitable.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  February 12, 2019                    By: /s/ Jon A. Tostrud
                                                   Jon A. Tostrud, Esq.
                                    **TOSTRUD LAW GROUP, P.C.**
                                    1925 Century Park East, Ste. 2100
                                    Los Angeles, CA. 90067
                                    Tel: (310) 278-2600
                                    Fax: (310) 278-2640
                                    Email: jtostrud@tostrudlaw.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***

## VERIFICATION

I, RAJIV CHUGH, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing.  To those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Oracle Corporation common stock at all relevant times.

RAJIV CHUGH

## VERIFICATION

I, SARITA CHUGH, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing.  To those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Oracle Corporation common stock at all relevant times.

SARITA CHUGH